No. 17-10548

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT

UNITED STATES OF AMERICA
Plaintiff-Appellee,

v.

HELAMAN HANSEN
Defendant-Appellant.

On Appeal from the United States District Court
for the Eastern District of California

Honorable Morrison C. England, Jr.
United States District Judge

U.S. District Court Case No. 2:16-cr-00024-MCE-1

———————————————

OPENING BRIEF OF APPELLANT

———————————————

HEATHER E. WILLIAMS
Federal Defender
CAROLYN M. WIGGIN
Assistant Federal Defender
801 "I" Street, 3rd Floor
Sacramento, California  95814
Telephone: (916) 498-5700

Attorneys for Defendant-Appellant
HELAMAN HANSEN

<u>Table of Contents</u>

Table of Authorities ...................................................................................iv

I.    Jurisdictional Statement ...................................................................1

II.   Bail Status ........................................................................................2

III.  Statement of Issues Presented for Review ......................................2

IV.  Statement of the Case.......................................................................3

    A.   Statement of Facts ...................................................................3

    B.   Procedural History ...................................................................9

        1.    Superseding Indictment.................................................9

        2.    Government's Trial Brief ...............................................9

        3.    Government's Selected Excerpts of Recorded Telephone
            Conversation from the Sacramento County Jail Admitted into
            Evidence. .....................................................................10

        4.    Government's Selected Excerpts of Internet Videos Admitted
            into Evidence...............................................................13

        5.    Government's Selected Excerpts of Recordings of Interviews
            with Law Enforcement Admitted into Evidence. ....................14

        6.    Mr. Hansen Prohibited from Admitting into Evidence Recording
            of Tour He Gave Immigration Officials. ..................................15

        7.    Dismissal of Count Ten.................................................16

        8.    "Intent to Defraud" Jury Instructions............................16

        9.    Verdict.........................................................................18

        10.  Motion to Dismiss Counts Seventeen and Eighteen ................19

        11.  Sentencing ...................................................................19

i

a.    Advisory Presentence Investigation Report..........................................19

b.    Parties' Objections and Sentencing Memoranda...............................21

c.    Sentencing Hearing..................................................................23

V.   Summary of the Argument.................................................................25

VI.  Argument .......................................................................................26

A.   Standards of Review ...................................................................26

B.   The District Court Abused Its Discretion in Refusing to Admit
     Evidence Required Under Federal Rule of Evidence 106............................28

C.   The District Court Abused its Discretion in Barring Mr. Hansen
     from Introducing Audiotape Evidence That Was Relevant to His
     State of Mind at the Time of the Offense. ........................................34

D.   The District Court's Erroneous Instruction on Intent to Defraud
     Misstated the Essential Elements of the Mail and Wire Fraud Offenses......35

E. The District Court Erred in Failing to Dismiss Counts Seventeen
     and Eighteen..................................................................................41

1.   On Its Face 8 U.S.C. Section 1324(a)(1)(A)(iv) is Void for
     Vagueness. ..............................................................................41

2.   8 U.S.C. Section 1324(a)(1)(A)(iv) is Overbroad in Violation
     of the First Amendment. ............................................................44

3.   8 U.S.C. Section 1324(a)(1)(A)(iv) is Unconstitutional as Applied
     to Mr. Hansen.........................................................................47

F. The District Court Abused Its Discretion in Applying the
     Sophisticated Means Enhancement. ................................................48

G. The District Court Abused Its Discretion in Applying the
     Leader/Organizer Adjustment.......................................................51

ii

H. The District Court Abused Its Discretion by Applying the
   Abuse of Position of Trust Adjustment. ...........................................53

I. The Statutory Maximum Sentence of 240 Months Imprisonment              is
   Substantively Unreasonable...............................................................56

VII. Conclusion .......................................................................................58

Table of Authorities

Federal Constitution

Fifth Amendment to the United States Constitution.................................................38

First Amendment to the United States Constitution ....................................... *passim*

Sixth Amendment to the United States Constitution ...............................................38

Federal Cases

*Arizona v. United States*, 567 U.S. 387 (2012)................................................... 43, 47

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) .........................................44

*Brandenburg v. Ohio*, 395 U.S. 444 (1969)..............................................................45

*Connally v. General Constr. Co.*, 269 U.S. 385 (1926) ...........................................41

*Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998) .......................................47

*Gall v. United States*, 552 U.S. 38 (2007) ..............................................................27

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .......................................... 42, 44

*Hill v. Colorado*, 530 U.S. 703 (2000) ....................................................................42

*Johnson v. United States*, 135 S. Ct. 2551 (2016) ...................................................41

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) .........................................................45

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ................................................43

*Neder v. United States*, 527 U.S. 1 (1999)..............................................................40

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) .................................. 44, 45

iv

*Simon & Schuster v. Members of the New York State Crime Victims Bd.*,
502 U.S. 105 (1991) ........................................................................44

*Stinson v. United States*, 508 U.S. 36 (1993) .........................................48

*United States v. Adebimpe*, 819 F.3d 1212, (9th Cir.), *cert. denied*,
137 S. Ct. 317 (2016) ....................................................................54

*United States v. Adepoju*, 756 F.3d 250 (4th Cir. 2014) .........................49

*United States v. Alkins*, 925 F.2d 541 (2d Cir. 1991) .............................37

*United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) .................... 28, 56

*United States v. Brown*, 877 F. Supp. 2d 736 (D. Minn. 2012)....... 49, 50

*United States v. Brown*, 879 F.3d 1043 (9th Cir. 2018) .........................28

*United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996) ........... 33, 34

*United States v. Coutchavlis*, 260 F.3d 1149 (9th Cir. 2001).................42

*United States v. Dees*, 34 F.3d 838, 842 (9th Cir. 1994) ........................35

*United States v. Dorrell,* 758 F.2d 427 (9th Cir. 1985) ..........................32

*United States v. Espinoza*, 880 F.3d 506 (9th Cir. 2018) ................. 26, 27

*United States v. Exec. Recycling, Inc.*, 953 F. Supp. 2d 1138
(D. Colo. 2013) ...................................................................... 50, 51

*United States v. Fernandez*, 839 F.2d 639 (9th Cir. 1988)............. *passim*

*United States v. Gasca-Ruiz*, 852 F.3d 1167 (9th Cir.) (*en banc*),
*cert. denied*, 138 S. Ct. 229 (2017) ................................................28

*United States v. Gaudin*, 515 U.S. 506 (1995) .......................................39

*United States v. Harder*, 116 F. Supp. 3d 1197 (D. Or. 2015) ...............37

*United States v. Johnson*, 507 F.3d 793 (2d Cir. 2007)............................................33

*United States v. Kaczynski*, 551 F.3d 1120 (9th Cir. 2009).....................................27

*United States v. Kaminski*, 692 F.2d 505 (8th Cir.1982)..........................................32

*United States v. Kozminski*, 487 U.S. 931 (1988).....................................................43

*United States v. Lothian*, 976 F.2d 1257 (9th Cir. 1992)..........................................37

*United States v. Mendoza-Benitez*, 119 F. Supp. 2d 48 (D.P.R. 2000) ..................55

*United States v. Meredith*, 685 F.3d 814 (9th Cir. 2012) ........................................47

*United States v. Montano*, 250 F.3d 709 (9th Cir. 2001)..........................................49

*United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014) ..........................................47

*United States v. Quinones-Chavez,* 641 F. App'x 722 (9th Cir.),
    *cert. denied*, 137 S. Ct. 94 (2016) (unpublished)...................................................32

*United States v. Rashkovski*, 301 F.3d 1133 (9th Cir. 2002) ...................................42

*United States v. Rivero*, 889 F.3d 618 (9th Cir. 2018) .............................................27

*United States v. Robertson*, 875 F.3d 1281, 1286 (9th Cir. 2017) .........................27

*United States v. Sawyer*, __ F.3d __, 2018 WL 3028681 (2d Cir. June 19, 2018)..57

*United States v. Serang*, 156 F.3d 910 (9th Cir. 1998)............................................35

*United States v. Shipsey*, 363 F.3d 962 (9th Cir. 2004).............................................17

*United States v. Sutton*, 801 F.2d 1346 (D.C. Cir. 1986) ................................. 32, 33

*United States v. Szabo*, 760 F.3d 997 (9th Cir. 2014) .............................................27

*United States v. Tahkalov*, 827 F.3d 1307 (11th Cir. 2016) ....................................16

vi

*United States v. Thomsen*, 830 F.3d 1049 (9th Cir. 2016) ............................... 28, 54

*United States v. Thum*, 749 F.3d 1143 (9th Cir. 2014) ............................................42

*United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010)............................... 17, 38

*United States v. Vazquez-Hernandez*, 849 F.3d 1219 (9th Cir. 2017).....................39

*United States v. Walter-Eze*, 869 F.3d 891 (9th Cir. 2017) ....................................52

*United States v. Whitney*, 673 F.3d 965 (9th Cir. 2012).........................................51

*Watts v. United States*, 394 U.S. 705 (1969) .........................................................48

Federal Statutes

18 United States Code Section 1324................................................................. *passim*

18 United States Code Section 1341.....................................................................1, 9

18 United States Code Section 1343................................................................. 1, 38

18 United States Code Section 3402.........................................................................1

18 United States Code Section 3553................................................... 21, 27, 56, 57

28 United States Code Section 1291.........................................................................1

8 United States Code Section 1227.......................................................................47
Immigration Reform and Control Act of 1986, Pub. L No. 99–603 § 112,
    100 Stat. 3359........................................................................................43

<u>Federal Rules</u>

Federal Rule of Appellate Procedure 4 ...................................................................1

Federal Rule of Evidence 106......................................................................... *passim*

Federal Rule of Evidence 801 ........................................................................... 1, 32

Federal Rule of Evidence 803 ................................................................34

United States Sentencing Guidelines

United States Sentencing Guidelines Manual, Section 2B1.1 ........................ *passim*

United States Sentencing Guidelines Manual, Section 2L1.1 ...............................20

United States Sentencing Guidelines Manual, Section 3A1.1 ...............................20

United States Sentencing Guidelines Manual, Section 3B1.1 ........................ *passim*

United States Sentencing Guidelines Manual, Section 3B1.3 ........................ *passim*

United States Sentencing Guiidelines Manual, Section 3C1.1 ...............................20

United States Sentencing Guidelines Manual, Section 5K2.13 ........................ 21, 56


Other Authorities

Jack Nicas, *YouTube Tops 1 Billion Hours of Video a Day,*
  *on Pace to Eclipse TV*, Wall Street Journal Feb. 17, 2017 ..................................51

Ninth Circuit Manual of Model Criminal Jury Instructions, 2010 Edition,
  Instruction No. 5.12 ............................................................................35

Ninth Circuit Manual of Model Criminal Jury Instructions, 2010 Edition,
  Instruction No. 3.16 ............................................................................17

United States Sentencing Guidelines Commission, "Quick Facts" re Theft,
  Property, and Fraud Offenses in Fiscal Year 2017 .............................................57

No. 17-10548

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT

| UNITED STATES OF AMERICA, | United States District Court Case No. 2:16-cr-00024-MCE-1 |
|---|---|
| Plaintiff-Appellee, | |
| v. | United States District Court, Eastern District of California, Sacramento |
| HELAMAN HANSEN, | |
| Defendant-Appellant. | |

## I.  Jurisdictional Statement

On March 2, 2017, the government filed a superseding indictment charging Mr. Hansen with violations of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 8 U.S.C. § 1324(a)(1)(A)(iv) & (B)(i).  The district court had jurisdiction over this matter pursuant to 18 United States Code § 3231.

The district court's decision is final because it resolved all disputes between the parties.  Because this is a direct appeal from a final district court judgment, this Court has jurisdiction pursuant to 28 U.S.C. Section 1291.

The district court issued the judgment on December 18, 2017.  ER II p. 109; CR 189.  Mr. Hansen filed his Notice of Appeal on December 20, 2017.  ER II p. 108; CR 192.  The appeal is timely under Federal Rule of Appellate Procedure 4(b)(1)(A)(i).

1

**II.    Bail Status**

Mr. Hansen is in the custody of the Federal Bureau of Prisons and has a scheduled release date of September 18, 2034.

**III.    Statement of Issues Presented for Review**

1.  Where the government introduced into evidence carefully tailored excerpts of recordings that favored the prosecution theory, did the district court err in declining Mr. Hansen's requests that additional excerpts necessary for proper context also be admitted into evidence?

2.  Did the district court err in refusing to allow Mr. Hansen to introduce audiotape evidence that was relevant to his state of mind at the time of the offense?

3.  Did the "Intent to Defraud" instruction suggest that good faith belief does not always negate specific intent to defraud?

4.  Should Counts Seventeen and Eighteen have been dismissed on constitutional grounds?

5.  Where the AHA adult adoption program was conducted in the open using commonplace technology, did the district court abuse its discretion in applying the sophisticated means enhancement?

6.  Where the government took the position that Mr. Hansen alone knew the AHA adult adoption program was fraudulent and failed to present

evidence of others' knowledge, did the district court abuse its discretion in applying a leadership adjustment?

7. Where Mr. Hansen did not claim to hold a position that gives rise to a fiduciary duty to AHA customers, and where none of the AHA customers testified they trusted him because he claimed to have a doctorate in immigration law, did the district court abuse its discretion in applying the adjustment for abuse of a position of trust?

8. Is Mr. Hansen's 240-Month Sentence substantively unreasonable?

## IV. Statement of the Case

### A. Statement of Facts

The government called a number of witnesses who told a similar story. They were living in the United States without legal status when they learned about Mr. Hansen's "Americans Helping Americans," or "AHA" organization or one of its affiliates.[1]  They learned that AHA offered a program purporting to assist undocumented immigrants in becoming United States citizens through adoption by a United States citizen.  They paid amounts ranging from $550 to $10,000 to participate in the program.  AHA or an affiliate would facilitate their adoption by a United States citizen, a lawful proceeding that took place in a California Superior

---

[1] The organizations affiliated with AHA included Community Independent Business Owners, Native Hawaiian and Pacific Islanders, Fijians Helping Fijians, and the International Cultural Center.

3

Court. After the adoption, the California Department of Public Health mailed the adoptive parent a "delayed registration of birth" certificate reflecting the adoption. Despite the adult adoption and new birth certificate, however, the witnesses did not become United States citizens. This is because, in reality, an adult adoption is not a path to United States citizenship.

AHA customers testified that they participated in the program because they wanted to obtain United States citizenship. ER II pp. 233, 236-37; CR 181, pp. 132, 192-93. They believed claims that Viola Hansen, Mr. Hansen's wife, and others had obtained citizenship through adult adoption. ER II pp. 234, 235, 238; CR 181, pp. 139, 169, 236; ER II pp. 230-31; CR 181-1, pp. 372, 410; ER II pp. 226-27; CR 181-2, pp. 436-37; ER II p. 223; CR 181-3, p. 702; ER II p. 210; CR 181-4 p. 960. None of them testified that they placed a special level of trust in Mr. Hansen because he claimed he was an "immigration specialist" with a Ph.D.

Two individual cases formed the basis for the charges in Counts Seventeen and Eighteen. The first involved Epeli Veisa, an individual with dual citizenship of Fiji and Great Britain. In January of 2014, he entered the United States on a visitor's visa that allowed him to remain in the United States until July of 2014. ER II p. 202; CR 181-4, p. 909. Mr. Veisa met Mr. Hansen and learned of the adult adoption/citizenship program and paid to participate in the program. ER II p. 202-206; CR 181-4, p. 909-13. In March of 2014, Mr. Veisa asked Mr. Hansen if

4

he should go to the United Kingdom "or come back and try for this," and Mr. Hansen told him he "shouldn't worry about it, about my visa. Once I go through the adult adoption process, then I get citizenship." ER II pp. 205-06; CR 181-4, pp. 912-13. As his June, 2014,[2] adult adoption date approached, Mr. Hansen again told Mr. Veisa not to worry about his visa expiring but to stay in the United States and continue the adult adoption process. ER II pp. 207-08; CR 181-4, pp. 918-19.

The second case involved Mana Nailati. He was from Fiji but was living in Rwanda when he learned of the adult adoption program. ER II p. 214; CR 181, p. 994. He entered the United States in August, 2014, on a visa that permitted him to remain in the United States until February of 2015. ER II p. 221; CR 181-4, p. 1022. Mr. Nailati's aunt paid for Mr. Nailati to participate in the adult adoption program and adopted him in November of 2014. ER II pp. 215-16, 219; CR 181-4, pp. 1003-04, 1007; ER II p. 188; CR 181-5, p. 1108. Mr. Nailati discussed his visa expiration date with Mr. Hansen and Mr. Hansen told Mr. Nailati he was "safe." ER II pp. 220; CR 181-4, pp. 1018; ER II p. 189; CR 181-5, p. 1109.

Several AHA employees testified at trial. The government's theory at trial was that of all the people working at AHA, only Mr. Hansen knew that adult adoptions would not result in citizenship. The government did not present evidence that any of the other key actors at AHA, including Mr. Hansen's wife Viola Hansen, and

---

[2] ER II p. 209; CR 181-4, p. 938.

AHA employees Jeffrey Sevier and Newalow Weekes, had any idea that the adult

adoption could not lead to citizenship.

In closing, the government argued to the jury:

> Now, those [federal law enforcement] agents, during that interview
> [of Mr. Hansen], went on to ask another question that helps
> demonstrate the defendant's intent to defraud. They asked him, well,
> who else at AHA and NHPI knew that no one had become a citizen?
> And he answered no one. Just myself. And he specifically agreed,
> Jeff Sevier did not know. Newalow Weekes did not know. Viola
> Hansen did not know. He said only he knew.

> And the agents asked him, well, why didn't you tell them? And he
> said, well, I didn't want to tell them because it would undermine, you
> know, this thing that I believe, that maybe it will work in the future,
> that the components that I put together means that it will have to
> work. *That's what really happened in this case. That's what Hansen*
> *really believed. That's what['s] really true.*

ER II p. 126; CR 98, p. 1905 (emphasis added).

The final PSR confirmed that Jeffrey Sevier told the FBI he believed Mr.

Hansen's claim that adult adoption could lead to citizenship. PSR ¶ 20. Sevier

believed that Mr. Hansen's wife Viola achieved citizenship through adult adoption.

PSR ¶ 20.

In February of 2015, Nai Saelee, an immigration officer at the Department

of Homeland Security, sent Mr. Hansen a letter asking him to come to his office to

discuss a citizenship application Mr. Hansen had submitted. ER II p. 143; CR 181-

7, p. 1613. Mr. Saelee worked for the Fraud Detection and National Security

6

branch of USCIS. ER II p. 144; CR 181-7, p. 1614. Mr. Hansen went to Mr. Saelee's office and described the AHA program to Mr. Saelee. ER II pp. 143-44; CR 181-7, pp. 1613-14. After the meeting, Mr. Hansen sent Mr. Saelee numerous emails about his program, including a list of persons who had completed the adult adoption process. ER II p. 144; CR 181-7, p. 1614.

Mr. Hansen also invited Mr. Saelee and other immigration officials, as well as Congress member Ami Bera, to visit the AHA office. ER II pp. 139, 144-46; CR 181-7, pp. 1466, 1614-16. In April of 2015, Mr. Hansen gave Mr. Saelee, other immigration officials, and a staff member from Representative Bera's office a tour of the AHA office. ER II pp. 146-47; CR 181-7, pp. 1616-17. The tour lasted approximately three hours. ER II p. 140; CR 181-7, p. 1467. Mr. Hansen showed the group the AHA offices and explained how the program worked. ER II p. 140; CR 181-7, p. 1467. During the tour no one told Mr. Hansen he was violating the law. ER II pp. 149-50; CR 181-7, p. 1619-20.

Although there was evidence that Mr. Hansen was informed that the adult adoption program would not lead to citizenship, there was also evidence that Mr. Hansen held an irrational belief that the adult adoption immigration program would work. George Chiu, who recruited clients for AHA, said that when Mr. Hansen was told that lawyers did not believe the program would work, Mr. Hansen responded that most lawyers did not understand the program. ER II p. 224; CR

7

181-3, p. 781.  Mana Nailati, who worked at AHA and interacted with Mr. Hansen almost every day, testified that Mr. Hansen seemed to be proud of the immigration program.  ER II p. 190-92; CR 181-5, p. 1113-15.  Mr. Hansen himself testified as to his belief that under a United Nations law, adult adoption could lead to citizenship.  ER II pp. 136-37; CR 181-7, pp. 1453-55.  His belief stemmed from what he called "the Hague law" and its treatment of adoption.  ER II p. 141; CR 181-7, p. 1479.  Mr. Hansen testified that in his mind, AHA was never a scheme to deceive or cheat people.  ER II p. 142; CR 181-7, p. 1498.

Expert testimony was introduced indicating Mr. Hansen suffered from hyperthymia, "which basically looks like someone who has hypomania almost constantly."  ER II p. 153; CR 181-7, p. 1640.  Psychologist Frank Weber testified that a person with this condition could continue to believe in and promote a program despite being presented with evidence that it did not work because the person

> would have difficulty kind of connecting the dots, if you will. So that the racing thoughts plays a role, distractibility, difficulty focusing on one thing.  Or, on the opposite side of things, becoming hyper-focused to exclusion of other important factors.
>
> And the other factor that may play a role is that the grandiosity or inflated self-esteem is common with hypomania.  Thinking that they know best, basically.

ER II p. 154; CR 181-7, p. 1643.

8

## B. Procedural History

### 1. Superseding Indictment

On March 2, 2017, the government filed a superseding indictment that included 18 counts. ER II p. 254; CR 62. Counts One through Thirteen charged mail fraud under 18 U.S.C. § 1341. Those counts focused on thirteen instances in 2014 through 2016 in which Mr. Hansen allegedly caused documents to be mailed as part of a scheme to induce individuals to purchase memberships in the adult adoption program. Counts Fourteen through Sixteen charged Mr. Hansen with violating 18 U.S.C. § 1341, wire fraud, by two instances of electronically transferring money between bank accounts (Counts Fourteen and Sixteen) and one instance of receiving an email from an individual (Count Fifteen), all in furtherance of the alleged fraudulent scheme. In Counts Seventeen and Eighteen, Mr. Hansen was charged with violating 8 U.S.C. § 1324(a)(1)(A)(iv) and (B)(i) by acting for private financial gain in encouraging two persons to reside in the United States in reckless disregard of the fact that such residence would be unlawful.

### 2. Government's Trial Brief

In its Trial Brief, the government stated

the weight of the evidence supports the conclusion that Defendant carried out his fraud scheme without [former AHA employees'] knowledge. As set forth above, in a post-arrest interview Defendant admitted only he knew the Migration Program had never worked and could not work. Moreover, in addition to a general exculpation of

9

other AHA, NHPI, and CIBO employees, Defendant specifically
exonerated his top-level deputies by name.

ER II p. 242; CR 97, p. 15 n. 5.

### 3. Government's Selected Excerpts of Recorded Telephone Conversation from the Sacramento County Jail Admitted into Evidence.

The government sought to introduce into evidence an excerpt of a recording
of a telephone call Mr. Hansen had while detained before trial at the Sacramento
County Jail with another individual he addressed as "Bishop."  In the telephone
call, the "Bishop" tells Mr. Hansen he is sorry Mr. Hansen is in jail.  Mr. Hansen
responds, "That's fine . . . that's fine . . . one of those things I know I will end up
here . . ."  ER II p. 246; CR 78-1, p. 2.  Mr. Hansen continues "only because of my
wanting to get my message across. . . It was nothing else . . it was pushing the
whole thing too far."  *Id.*  After speaking to the bishop about other matters, Mr.
Hansen states, "I was pre-plan to go through all of this . . . so I keep reading
through Joseph of Egypt . . . Everybody has to go . . . if you want to take this to a
different level . . . you have to do it . . . and I have to do it. . . ."  ER II p. 247; CR
78-1, p. 3.  Later Mr. Hansen references the religious significance of his
predicament.  He explains that two years earlier he wrote to the "prophet" about
starting a "big" project to "help people" and the prophet wrote back saying, "Son
whatever you feel in your heart is what you need to do . . . go do it . . ."  ER II pp.

10

251-52; CR 78-1, pp. 7-8.  Mr. Hansen then said to the "Bishop," "most of the

people follow the Lord's instructions and they end up in jail everywhere, trying to

have a testimony of the truth . . ."  ER II p. 252; CR 78-1, p. 8.

On April 26, 2017, the sixth day of the trial, the government sought to

introduce an excerpt of the recording that included only the following:

> **Inmate:** Hello Bishop
> **Bishop:** How you doing?
> **Inmate:** Good, good . . .
> **Bishop:** you doing good you doing Ok?
> **Inmate:** mmm . . . fine, fine . . .
> **Bishop:** I'm so sorry you're . . . you're here
> **Inmate:** That's fine . . .that's fine . . .one of those things I know I will
> end up here . . .
> **Bishop:** mmhhmmm . . .
> **Inmate:** only because of my wanting to get my message across . . . It
> was nothing else . . . it was pushing the whole thing too far.

ER II p. 246; CR 78-1, p. 2; ER I pp. 101-02, CR 181-4 pp. 979-80 (prosecutor

explaining excerpt she wanted admitted).

The defense argued that if the government introduced a portion of the

recording, the entire recording should be admitted under Federal Rule of Evidence

106.  The defense pointed out that the government planned to argue Mr. Hansen's

statements that "I know I will end up here" and "it was pushing the whole thing too

far," were a "clean admission" of guilt.  ER I pp. 103; CR 181-4, pp. 981.  Other

parts of the conversation, the defense argued, indicated Mr. Hansen was using

religious concepts and metaphors when talking to "the Bishop."  *Id*.  Mr. Hansen

11

made reference to "Joseph," a biblical figure who was imprisoned for a morally

correct act,[3] and he indicated a belief that he had been trying to help people and

"follow the Lord's instructions." This, the defense argued,

> has a lot to say, potentially, about his mental state. And without that
> context, the jury is going to receive a distorted picture of what it is
> that those supposed [admissions] actually mean.

ER I p. 103; CR 181-4, p. 981:13-16.

The district judge rejected the defense's arguments, concluding "[r]eligion

had nothing to do with this." ER I p. 103; CR 181-4, p. 981:23. When defense

counsel noted "intent is central to the issues that the jury will have to decide," (ER

I p. 104; CR 181-4, p. 982:14-15), the court responded that if Mr. Hansen claimed

he was following "God" in undertaking the actions at issue, "[t]hat's just getting

straight-up crazy." ER I p. 104; CR 181-4, p. 982:22. The court ruled that Mr.

Hansen's statements "I knew I'd end up here" and "I pushed the whole thing too

far" were a "straight-up admission." ER I p. 105; CR 181-4, p. 983:8-10. The

court continued that it had "nothing to do with whether or not he thinks he's a

prophet or whatever he is in jail, and he's doing all the right things for religious

reasons. That's irrelevant." ER I p. 105; CR 181-4, p. 983:20-23. Reiterating that

"[r]eligion is absolutely irrelevant" to the meaning of anything Mr. Hansen said,

---

[3] In the Bible's Book of Genesis, Joseph is thrown into prison for doing the *right*
thing in rejecting the advance's of his employer's wife.
http://www.bbc.co.uk/religion/religions/judaism/history/joseph.shtml.

"and especially for the doctrine of completeness," the court overruled the

defendant's objection.  ER I p. 106; CR 181-4, p. 984:3-4.  After a break, the

district judge stated the portion of the recording Mr. Hansen sought to admit was

self-serving hearsay under *United States v. Fernandez*, 839 F.2d 639 (9th Cir.

1988).  ER I p. 107; CR 181-4, p. 985.

An excerpted recording of the telephone call containing the first nine lines of

dialogue was admitted as Government Exhibit 3601 and played for the jury.  ER II

p. 211-12; CR 181-4, pp. 991-92.  In closing argument, the government argued:

> Hansen's intent to defraud is further demonstrated by his admission
> to his bishop on the jail call you heard on Government's Exhibit 3601.

ER II p. 125; CR 198, p. 1852:9-11.

### 4. Government's Selected Excerpts of Internet Videos Admitted into Evidence.

The government sought to introduce into evidence excerpts of video

recordings Mr. Hansen posted to the Internet to promote his adult adoption

program.  ER I p. 89; CR 181-5, p. 1050.  The government excerpted these videos

to include only the moments it wanted the jury to see.  The defense asked to add

additional clips from the videos in order to avoid distortion and preserve the

fairness of the presentation of the evidence.  ER I p. 90; CR 181, p. 1051.  The

court rejected the defense's request.  The court ruled that

> the bottom line is the statements were made, and anything that comes
> in afterwards to try to, quote, unquote, explain what he was saying is
> nothing more than self-serving hearsay.

ER II p. 94; CR 181-5, p. 1055:4-7.   The government was allowed to introduce

into evidence the videos excerpted in the way the government chose.  ER II p. 193;

CR 181-5, p. 1239.  Three excerpted videos were played for the jury.  ER II pp.

194, 196, 200; CR 181-5, pp. 1240, 1242, 1246.

### 5. Government's Selected Excerpts of Recordings of Interviews with Law Enforcement Admitted into Evidence.

Mr. Hansen was interviewed by law enforcement agents on December 22, 2015,

and February 11, 2016.  ER II pp. 89-90; CR 181-5, pp. 1050-51.  The December

22nd interview lasted two hours and 48 minutes and the February 11th interview

lasted three hours and 30 minutes.  ER II p. 177; CR 181-6, p. 1379.  The

government sought to introduce short excerpts of the recordings of the interviews.

*Id*.  The government wished to introduce excerpts it viewed "as especially

powerful and incriminating."  ER I pp. 98-99; CR 181-5, p. 1059-60.  Mr. Hansen

asked to have additional clips of the interview recordings played for the jury to put

Mr. Hansen's words into the context of the conversations.  ER I pp. 90-91; CR

181-5, pp. 1051-52.  Citing *Fernandez*, 839 F.2d 639, the court denied Mr.

Hansen's request.  ER II p. 94; CR 181-5, p. 1055.  The government's selected

excerpts of recordings were admitted into evidence and played for the jury. ER II

pp. 156-74; CR 181-6, pp. 1342-51, 1368-76.

### 6. Mr. Hansen Prohibited from Admitting into Evidence Recording of Tour He Gave Immigration Officials.

The defense requested permission to admit into evidence nine audio recording

clips of the AHA tour Mr. Hansen gave immigration and congressional officials.

ER I p. 81; CR 181-7, p. 1428. The tour had been recorded by USCIS fraud

investigators. *Id*. The government objected on hearsay grounds. ER I pp. 82-83;

CR 181-7, pp. 1429-30. Mr. Hansen responded that he did not seek to introduce

the clips for the truth of the matters stated but to show his state of mind. ER I p.

84; CR 181-7, p. 1431. The clips reflect Mr. Hansen proudly leading immigration

officials and a Congressional staff member around the AHA offices and talking

about the his program. The evidence would have bolstered the defense theory that

Mr. Hansen believed in the validity of the program he was offering because it

would show him openly describing it to people he knew worked for USCIS. ER I

p. 84; CR 181-7 p. 1431. The court ruled in favor of the government, stating:

> it is straight-up hearsay. Period. And the reason you're offering it is to
> show his state of mind at the time, and that's really -- you can't show
> that.

ER I p. 87; CR 181-7, p. 1434.

### 7. Dismissal of Count Ten

At the end of the government's case, and again at the end of his case, Mr. Hansen moved for a judgment of acquittal as to all counts under Federal Rule of Criminal Procedure 29. ER II pp. 178-85; CR 181-6, pp. 1413-1420, and ER II pp. 130-31; CR 181-8, pp. 1784-85. The government agreed it had not produced evidence in support of Count Ten and therefore successfully moved to dismiss it. ER II p. 179; CR 181-6, p. 1414.

### 8. "Intent to Defraud" Jury Instructions

Mr. Hansen's third proposed jury instruction was titled "Intent to Defraud Defined" and read:

> An intent to defraud is an intent to deceive or cheat.
> If a defendant does not intend to harm the victim then he has not intended to defraud the victim.[4]
> You may determine whether the defendant had an honest, good faith belief in the representations he made in determining whether or not the defendant acted with intent to defraud.[5]
> Good faith is a complete defense to a charge that requires intent to defraud. A defendant is not required to prove good faith. The Government must prove intent to defraud beyond a reasonable doubt. An honestly held belief or an honestly formed belief cannot be fraudulent intent even if the opinion or belief is mistaken. Similarly,

---

[4] *United States v. Tahkalov*, 827 F.3d 1307, 1313 (11th Cir. 2016).

[5] The Commentary to Ninth Cir. Model Instruction 3.16 endorses this formulation –with minor changes – in a case where defendant maintains he acted in good faith.

16

evidence of a mistake in judgment, an error in management, or carelessness cannot establish fraudulent intent.[6]

Ninth Circuit Model 3.16 (current ver., modified).

ER II p. 244; CR 87, p. 5.

The government offered its own "intent to defraud" instruction that read:

An intent to defraud is an intent to deceive or cheat.
It is no defense to fraud that the defendant honestly holds a certain opinion or belief, but also knowingly makes false or fraudulent promises, representations, or promises to others.

9TH CIR. CRIM. JURY INST. 3.16 (2010) (second sentence added); *United States v. Shipsey*, 363 F.3d 962, 967-68 (9th Cir.) (explicitly approving the language of this instruction and, because the trial court gave this instruction, holding that "no good faith instruction was necessary at all."); *United States v. Treadwell*, 593 F.3d 990, 994 (9th Cir. 2010) (approving as an accurate statement of the law an instruction that it is no defense to fraud that "[the defendant] honestly holds a certain opinion or belief, [but] also knowingly makes false or fraudulent promises, representations, or promises to others.").

ER II p. 240; CR 103, p. 51.

After both sides rested, the court heard argument regarding the proposed instructions. ER I pp. 67-79; CR 181-8, pp. 1799-1811, and ER I pp. 59-64; CR 198, p. 1819-24. The government defended its proposed instruction on the ground that the language was approved in *United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010). ER I pp. 60-61; CR 198, pp. 1820-21. In reference to the sentence, "It

---

[6] *United States v. Takhalov*, 827 F.3d 1307, 1317 (11th Cir. 2016).

is no defense to fraud that the defendant honestly holds a certain opinion or belief, but also knowingly makes false or fraudulent promises, representations, or promises to others," Mr. Hansen asked that the "last sentence not be read." ER I p. 64; CR 198, p. 1824:4-5. Mr. Hansen also stated that changing the word "knowingly" to "intentionally" would improve the instruction but clarified for the record that he objected to the last sentence of the instruction. ER I p. 64; CR 198, p. 1824:19-21. The district court noted his "objection to the last sentence in its entirety." ER I p. 64; CR 198, p. 1824:22-23. The court ruled that it would include the sentence the government requested regarding honest belief being "no defense" to fraud. ER I pp. 64-65; CR 198, pp. 1824-25.

The instruction, as read to the jury, stated:

> An intent to defraud is an intent to deceive or cheat. You may determine whether the defendant had an honest good faith belief in the truth of the specific misrepresentations alleged by the Government in determining whether or not the defendant acted with intent to defraud.
> It is no defense to fraud that the defendant honestly holds a certain opinion or belief but also intentionally makes false or fraudulent representations or promises to others.

ER II pp. 127-28; CR 198, pp. 1918-19.

### 9. Verdict

On May 9, 2017, the jury found Mr. Hansen guilty of all counts. CR 148.

18

### 10. Motion to Dismiss Counts Seventeen and Eighteen

On November 9, 2017, Mr. Hansen moved to dismiss Counts Seventeen and Eighteen on constitutional grounds. CR 165. Mr. Hansen argued 8 U.S.C. § 1324(a)(1)(A)(iv) is unconstitutionally overbroad because it burdens a substantial amount of speech protected by the First Amendment to the United States Constitution. Mr. Hansen also argued the subsection is void for vagueness. Finally, Mr. Hansen argued the subsection is unconstitutional as applied to him. The government opposed the motion.

On December 14, 2017, the court denied the motion to dismiss, stating

sometimes it is good to create new law and maybe this would be the perfect time to have something like this go on appeal and see what the Ninth Circuit does with it and we'll see what happens.

ER I p. 8; CR 200, p. 8.

### 11. Sentencing

#### a. Advisory Presentence Investigation Report

A final advisory PSR was filed and distributed to the parties on November 22, 2017. CR 170.[7] It calculated Mr. Hansen's advisory guidelines range as follows: Counts One through Sixteen were grouped together and Count Seventeen and Eighteen were grouped together but scored separately. PSR ¶ 33. For Counts One through Sixteen, the PSR used U.S.S.G. § 2B1.1 to arrive at a base offense

---

[7] Filed under seal.

level of 7.  PSR ¶ 34.  Under U.S.S.G. § 2B1.1(b)(1)(H), 14 levels were then added on the ground that the loss amount exceeded $550,000.  PSR ¶ 35.  6 levels were added under § 2B1.1(b)(2)(C) on the ground that the offense resulted in substantial financial hardship to 25 or more victims.  PSR ¶ 36.  The PSR also added 2 levels for "sophisticated means" under § 2B1.1(b)(10)(C) . PSR ¶ 37.  A 2-level upward adjustment was made under U.S.S.G. § 3A1.1(b)(1) on the ground that the victims of the offense were vulnerable.  PSR ¶ 38.  An additional 2-level upward adjustment was added under § 3B1.1(c) on ground that Mr. Hansen was an "organizer, leader, manager, or supervisor . . ."  PSR ¶ 39.  A 2-level upward adjustment was also made on the ground that Mr. Hansen abused a position of trust for purposes of § 3B1.3.  PSR ¶ 40.  Finally, a 2-level upward adjustment was made under § 3C1.1 for obstructing or impeding justice.  PSR ¶ 41.  The adjusted offense level for Counts One through Sixteen was 37.

For the group consisting of Counts 17 and 18, the PSR relied on U.S.S.G. § 2L1.1 for a base offense level of 12.  PSR ¶ 43.  Neither specific offense characteristics nor other adjustments were found applicable, resulting in a final offense level of 12 for the group.  PSR ¶ 48.

The total offense level was determined to be 37.  PSR ¶ 54.  Mr. Hansen had no criminal history points, placing him in Criminal History Category I.  PSR ¶ 63.  Mr. Hansen's advisory guidelines range was calculated as 210-262 months.  PSR

20

p. 23.  The PSR recommended a sentence of 210 months, as well as supervised

release, restitution, and special assessments.  PSR p. 23.

### b.  Parties' Objections and Sentencing Memoranda

In his formal objections to the PSR, Mr. Hansen objected to, among other

things, application of the sophisticated means characteristic (U.S.S.G. §

2B1.1(b)(10)(C)); the aggravating role adjustment under U.S.S.G. § 3B1.1(c); and

the adjustment for abusing a position of trust under U.S.S.G. § 3B1.3.  CR 172.

In his sentencing memorandum, Mr. Hansen argued in favor of a sentence of

three years.  CR 177.  Not only did he argue that his advisory Guidelines range was

lower than that calculated in the PSR, he also sought a downward departure under

United States Sentencing Guidelines Section 5K2.13, which provides that a

downward departure may be warranted if the defendant committed the offense

while suffering from a significantly reduced mental capacity that contributed

significantly to commission of the offense.  In addition, the defense sought a

downward variance, arguing that under 18 U.S.C. § 3553(a) factors, in light of Mr.

Hansen's mental health issues, physical issues, advanced age (64 years old), and

diabetes, a sentence of three years was appropriate.

Mr. Hansen attached to his sentencing memorandum a report by Robin F.

Lin, M.D., regarding Dr. Lin's psychiatric evaluation of Mr. Hansen.  ER II pp.

119-23; CR 177-1.  Dr. Lin concluded Mr. Hansen had Unspecified Bipolar

21

disorder that played a role in the offense. In particular, the disorder contributed to

Mr. Hansen's sense of grandiosity and belief that he could see patterns that others

could not. One of the distorted connections Mr. Hansen made was a belief that

because an adult adoption authentically makes the adoptee the child of the adopter,

the adoptee will take on the same legal rights as a naturally born child per

international "Hague" law. ER II p. 121; CR 177-1, p. 3. Mr. Hansen also had an

idea that a person's good civic behavior could make them a "successful citizen,"

and that it would be good for the United States government if more undocumented

immigrants became citizens and started paying taxes. *Id.* In Dr. Lin's opinion, "all

of these ideas became connected together due to his Unspecified Bipolar Disorder

as he believed he was seeing patterns and understanding laws that not even the

U.S. federal government could see." *Id.* Dr. Lin concluded that Mr. Hansen's

"psychiatric diagnosis and mindset contributed to the creation and running of his

business" in that "psychological factors played a much bigger role than financial

gain as to why the business was created and promoted." ER II p. 123; CR 177-1,

p. 5.

Dr. Lin's conclusion that mental illness, not financial enrichment, motivated

Mr. Hansen was consistent with his disastrous financial status at the time of

sentencing: he had no savings or income and owed numerous debts. PSR ¶ 82. His

22

sole assets were a printer and computer valued at $3,000 and a vehicle worth $600. PSR ¶ 82.

In its sentencing memorandum, the government argued for a sentence of 262 months.  CR 177.

### c.  Sentencing Hearing

At the sentencing hearing, Mr. Hansen argued that the "sophisticated means" enhancement provided in U.S.S.G. § 2B1.1(b)(10)(C) was improper.  He pointed out that he used his real name when he described the program and he never tried to avoid detection.  ER I pp. 21-22; CR 200, pp. 21-22.  He was not involved in relocating his business to another state to avoid detection.  The district court imposed the enhancement, ruling that use of YouTube and the Internet were techniques "that a general person who is trying to create fraud would not necessarily do or know how to do it."  ER I pp. 22-23; CR 200, pp. 22-23.[8]

Mr. Hansen objected to the organizer/leader adjustment provided for by U.S.S.G. § 3B1.1(c).  He pointed out that the adjustment requires proof that there were other "participants" who were criminally culpable and the government did not present evidence that anyone besides Mr. Hansen was criminally culpable.  ER I pp. 24-25; CR 200, pp. 24-25.  The government responded evidence suggested

---

[8] The PSR had referred to use of the state court system and having clients obtain ITINs has "sophisticated means" but the district court did not mention these in explaining the basis for the enhancement.

that Viola Hansen, Newalow Weekes, and Jeffrey Sevier were criminally culpable in that Newalow Weekes allegedly threatened victims and Viola Hansen lied to victims. It also argued the fraud was "extensive." ER I p. 26; CR 200, p. 26. The court ruled in favor of the government on the basis of a finding "that there was extensive activity." ER I p. 27; CR 200, p. 27.

Mr. Hansen next objected to the enhancement for abuse of a position of trust, U.S.S.C. § 3B1.3. He pointed out that there was no evidence the victims viewed him as holding a position worthy of a heightened level of trust. ER I p. 27; CR 200, p. 27. The government argued that the enhancement was warranted because the victims believed his false claims to be trained in immigration law and to have a Ph.D. ER I p. 28; CR 200, p. 28. The court again ruled in favor of the government, reasoning that "the individuals who were caught up in this scheme were very vulnerable, and they were trying to do their very best to become citizens of the United States." ER I p. 28; CR 200, p. 28. The court rejected Mr. Hansen's observation that it was conflating the concepts of vulnerable victim with abuse of trust. ER I p. 29; CR 200, p. 29. Later in the hearing the government had the court say "yes" to the government's statement that Mr. Hansen urged the victims to believe his interpretation of the law on the ground that he was an expert in immigration laws with a Ph.D. ER I p. 37; CR 200, p. 37.

24

The court found the offense level was 37 and the Criminal History Category was I, leading to an advisory guidelines range of 210-262 months of imprisonment. ER I p. 37; CR 200, p. 37. It also noted that the statutory maximum for Counts One through Sixteen was 240 months. ER I p. 37; CR 200, p. 37.

In light of the district court's ruling on the guidelines range, Mr. Hansen argued in favor of a sentence of eight to nine years. ER I p. 50; CR 200, p. 50. Defense counsel pointed out that although Mr. Hansen gave his victims false hope and hurt them financially, Mr. Hansen had mental deficits contributed to his offense conduct. ER I pp. 47-50; CR 200, pp. 47-50. In addition, Mr. Hansen had recently turned 65-years-old and did not need a lengthy prison sentence. ER I pp. 50-51; CR 200, pp. 50-51. The district court declined to depart downward or grant a downward variance and instead sentenced Mr. Hansen to the statutory maximum term of 240 months. ER I p. 53; CR 200, p. 53. The court also imposed a special assessment of $1,700, restitution of $576,264.22, and a supervised release term of two years. ER I p. 54; CR 200, p. 54.

## V.     Summary of the Argument

Mr. Hansen ran a non-profit that claimed customers could obtain United States citizenship through adult adoption. Adult adoption is not, in fact, a path to citizenship. Mr. Hansen sought to show the jury that, due in part to irrational thought patterns caused by mental illness, he actually believed the program would

25

work. The district court committed reversible legal errors in hampering Mr. Hansen from presenting his defense and improperly relieving the government of its burden of proof by (1) allowing to government to introduce snippets of recordings without granting Mr. Hansen's request that additional portions of the recordings that put the snippets into context be presented as well; (2) refusing to allow Mr. Hansen to introduce evidence relevant to his state of mind; and (3) giving a jury instruction that incorrectly conveyed that good faith does not negate specific intent to defraud.

The court also erred in declining to dismiss on constitutional grounds two counts charging Mr. Hansen for "encouraging" two persons to remain in the United States after their visas expired.

Finally, the district court applied unwarranted enhancements and adjustments when it calculated Mr. Hansen's advisory Guidelines range. The 240-month sentence it imposed is derived from an erroneous Guidelines calculation and is substantively unreasonable.

## VI.    Argument

### A. Standards of Review

This Court reviews the district court's exclusion of evidence for abuse of discretion. *United States v. Espinoza*, 880 F.3d 506, 511 (9th Cir. 2018). It first determines, under a *de novo* standard, whether the trial court identified the correct

26

legal rule. If it did not, this Court must conclude the district court abused its discretion. If the district court identified the correct legal rule, this Court must decide whether the district court's application of the rule was illogical, implausible, or without support. *Id*.

This Court reviews *de novo* whether the jury instructions accurately define the elements of a statutory offense. *United States v. Rivero*, 889 F.3d 618, 620 (9th Cir. 2018).

Whether a statute is unconstitutionally vague, overbroad, or unconstitutional as applied are reviewed *de novo*. *United States v. Robertson*, 875 F.3d 1281, 1286 (9th Cir. 2017); *United States v. Kaczynski*, 551 F.3d 1120, 1123 (9th Cir. 2009); *United States v. Szabo*, 760 F.3d 997, 1001 (9th Cir. 2014).

This Court reviews sentences using a two-step inquiry. First this Court must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007). This Court reviews the district court's factual findings for clear error and its interpretation of the Sentencing Guidelines *de novo*. *United States v. Thomsen*, 830 F.3d 1049,

27

1070 (9th Cir. 2016). A district court's application of the Sentencing Guidelines to the facts of a case is generally reviewed for abuse of discretion. *United States v. Gasca-Ruiz*, 852 F.3d 1167, 1170 (9th Cir.) (*en banc*), *cert. denied*, 138 S. Ct. 229 (2017). Miscalculating the guidelines range "is a significant procedural error that requires [the Court] to remand for resentencing" unless the error is harmless. *United States v. Brown*, 879 F.3d 1043, 1050-51 (9th Cir. 2018).

This Court reviews the substantive reasonableness of a sentence for abuse of discretion. *United States v. Autery*, 555 F.3d 864, 872 (9th Cir. 2009).

### B. The District Court Abused Its Discretion in Refusing to Admit Evidence Required Under Federal Rule of Evidence 106.

The district court allowed the government to introduce into evidence excerpts of audio and video recordings that were carefully pared to help the government paint its picture of the facts. That picture foregrounded snippets of evidence that portrayed Mr. Hansen as a remorseless liar and left out evidence that Mr. Hansen was a mentally ill man who actually believed in his adult adoption immigration program.

First, the government was allowed play small portion of a recorded telephone call between Mr. Hansen and his bishop in which Mr. Hansen said

> **Inmate:** Hello Bishop
> **Bishop:** How you doing?
> **Inmate:** Good, good . . .
> **Bishop:** you doing good you doing Ok?

28

**Inmate:** mmm . . . fine, fine . . .
**Bishop:** I'm so sorry you're . . . you're here
**Inmate:** That's fine . . .that's fine . . .one of those things I know I will
end up here . . .
**Bishop:** mmhhmmm . . .
**Inmate:** only because of my wanting to get my message across . . . It
was nothing else . . . it was pushing the whole thing too far.

ER II p. 246; CR 78-1, p. 2 and ER II p. 212; CR 181-4, p. 992.

The defense was not allowed to introduce additional parts of the conversation in which Mr. Hansen likened his plight to that of Joseph from the Old Testament, a figure who was imprisoned for doing the morally correct thing. The court also refused to allow the defense to play portions of the recording in which Mr. Hansen indicated he believed he was called by "the prophet" to start his program, and in which he reflected that people who follow the "Lord's instructions" end up in jail. ER II, pp. 247-253; CR 78-1, pp. 3-9. Because the prosecution was allowed to introduce the carefully selected fragment of the recording, the prosecutor was able to argue that Mr. Hansen admitted his intent to defraud in the telephone conversation. ER II p. 125; CR 198, p. 1852:9-11. The defense could not counter that Mr. Hansen was talking to the bishop in religious terms and expressing a belief that he had followed "the Lord's instructions," and like others who had done the right thing, was jailed as a result.

Later, the government was allowed to introduce excerpts of video recordings Mr. Hansen posted to the Internet promoting his adult adoption program. ER II p.

29

193; CR 181-5, p. 1239, and ER II pp. 194, 196, 200; CR 181-5, pp. 1240, 1242,

1246. The court refused to allow the defense to add clips of the videos in order

prevent the unfair distortion created by allowing the government alone to pick

which excerpts the jury would see. ER I pp. 93-94; CR 181-5, pp. 1054-55.

Finally, the government was allowed to introduce excerpts of recordings of Mr.

Hansen's interview by law enforcement agents. Mr. Hansen asked to have

additional clips of the interview recordings played for the jury to put his words into

the context of the conversations. ER I pp. 90-91; CR 181-5, pp. 1051-52. Citing

*United States v. Fernandez*, 839 F.2d 639 (9th Cir. 1988), the court denied Mr.

Hansen's request. ER I p. 94; CR 181-5, p. 1055.

Federal Rule of Evidence 106 provides "If a party introduces all or part of a

writing or recorded statement, an adverse party may require the introduction, at

that time, of any other part--or any other writing or recorded statement--that in

fairness ought to be considered at the same time." Fed. R. Evid. 106. In the

present case the district court declined Mr. Hansen's three requests to supplement

the portions of the recordings the government introduced with additional parts

"that in fairness ought to be considered at the same time" on the ground that they

were "self-serving hearsay" under *United States v. Fernandez*, 839 F.2d 639 (9th

Cir. 1988). ER I p. 107; CR 181-4, p. 985, and ER I p. 94; CR 181-5, p. 1055.

The district judge did not disagree with Mr. Hansen's argument that the

30

supplemental portions of recordings would have provided meaningful context for the jury. Indeed, as to the jail call, the district judge observed that the religious ideas Mr. Hansen expressed tended to show he was "just getting straight-up crazy" (ER I p. 104; CR 181-4, p. 982:22), a defense theory Mr. Hansen was trying to develop. The religious concepts Mr. Hansen invoked during parts of the conversation the jury did not hear would have revealed he was expressing a view that he was being jailed for doing something good, not that he was making a "clean admission" of guilt. As to the excerpts of Internet videos and the law enforcement interview videos, the court simply ruled that the portions Mr. Hansen wanted played were inadmissible hearsay under *Fernandez*. ER I p. 95; CR 181-5, p. 1055.

*Fernandez* is easily distinguishable from the present case. In *Fernandez*, the defendant tried to have a law enforcement agent testify that he made an exculpatory statement after his arrest. *Fernandez*, 839 F.2d at 640. Mr. Fernandez conceded the statement was inadmissible hearsay but argued it should be admitted "to forestall any assumption that he had admitted guilt by silence," despite the fact that the government never argued Mr. Fernandez's silence implied he was guilty. *Id*. Mr. Fernandez did not try to rely on Federal Rule of Evidence 106, nor would the rule be applicable since it only applies when one party introduces a portion of a writing or recorded statement that may be misinterpreted if considered without the

31

remainder of the writing or recorded statement. The government did not introduce

such evidence in *Fernandez*.

A district court abuses its discretion under Federal Rule of Evidence 106

when it excludes part of a statement if "the edited version . . . 'distorts the meaning

of the statement or excludes information substantially exculpatory of the

declarant." *United States v. Dorrell,* 758 F.2d 427, 434–35 (9th Cir. 1985)

(quoting *United States v. Kaminski*, 692 F.2d 505, 522 (8th Cir.1982)). In

addition, as the Honorable Judge Fisher discussed in his partial concurrence and

dissent in *United States v. Quinones-Chavez,* 641 F. App'x 722 (9th Cir.), *cert.*

*denied*, 137 S. Ct. 94 (2016) (unpublished), "[w]ise courts and commentators . . .

have concluded the rule of completeness should override, or 'trump,' the hearsay

rule" when the government has been allowed to introduce evidence of a portion of

a statement by a defendant under Fed.R.Evid. 801(d)(2) (opposing party's

statement). *Quinones-Chavez*, 641 F. App'x 722 at 730 (Fisher, J., concurring in

part and dissenting in part). In *United States v. Sutton*, 801 F.2d 1346 (D.C. Cir.

1986), the District of Columbia Circuit observed one purpose of Federal Rule of

Evidence 106 is to "correct a misleading impression crated by taking matters out of

context." *Sutton*, 801 F.2d at 1368. It concluded that

> Rule 106 can adequately fulfill its function only by permitting the
> admission of some otherwise inadmissible evidence when the court
> finds in fairness that the proffered evidence should be considered

32

> contemporaneously.  A contrary construction raises the specter of
> distorted and misleading trials, and creates difficulties for both
> litigants and the trial court.

*Id*.; *see also United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007)  ("even

though a statement may be hearsay, an omitted portion of the statement must be

placed in evidence if necessary to explain the admitted portion, to place the

admitted portion in context, to avoid misleading the jury, or to ensure fair and

impartial understanding of the admitted portion.") (internal quotation and citations

omitted).

In *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996), this Court

held that Federal Rule of Evidence 106 does not compel the admission of

otherwise inadmissible hearsay.  Mr. Hansen now argues that under Federal Rule

of Evidence 106, if one party has introduced a part of a writing or recorded

statement, the other party should be allowed to introduce other parts that provide

the necessary context for fair interpretation of the admitted evidence, even if those

other parts would otherwise be excluded as hearsay.  Mr. Hansen contends that

*Collicott* should be interpreted in light of the fact that (1) *Collicott* did not

technically involve Rule 106 since the evidence at issue was not a writing or

recorded statement, and (2) in *Collicott* there was no concern that a party had

admitted  a "misleadingly-tailored snippet" from a statement that needed to be

corrected for a fair understanding.  *Collicott*, 92 F.3d at 983.  However, to the

33

extent Mr. Hansen's argument is contrary to *Collicott*, Mr. Hansen contends the holding of *Collicott* is wrong and should be reconsidered by this Court.

### C. The District Court Abused its Discretion in Barring Mr. Hansen from Introducing Audiotape Evidence That Was Relevant to His State of Mind at the Time of the Offense.

The district court refused Mr. Hansen's request to admit clips of an audio recording of a tour Mr. Hansen gave USCIS employees and a congressional staff member on the ground that "it is straight-up hearsay. Period. And *the reason you're offering it is to show his state of mind at the time, and that's really -- you can't show that*." ER I p. 87; CR 181-7, p. 1434 (emphasis added).

In fact, under Federal Rule of Evidence 803(3) a "statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)," does not fall within the rule against hearsay. The defense wanted to show Mr. Hansen's manic mental state during the time of the alleged offense, and the videotape would have shed light on Mr. Hansen's emotional condition and belief in the program. Under Federal Rule of Evidence 803(3), the recordings fell outside of the rule against hearsay and Mr. Hansen should have been allowed to admit them into evidence.

### D. The District Court's Erroneous Instruction on Intent to Defraud Misstated the Essential Elements of the Mail and Wire Fraud Offenses.

This Court has long recognized that an element of federal mail and wire fraud is that a defendant have an "intent to defraud." *See*, *e.g*., *United States v. Serang*, 156 F.3d 910, 914 (9th Cir. 1998). "Good faith is always a defense to fraud." *United States v. Dees*, 34 F.3d 838, 842 (9th Cir. 1994).

Here the district court instructed the jury that "[a]n intent to defraud is an intent to deceive or cheat." ER II pp. 127-28; CR 198, pp. 1918-19. Given that Mr. Hansen put forth a defense that he acted in good faith and therefore did not have the required intent to defraud, the district court gave the following approved[9] additional instruction:

> You may determine whether a defendant had an honest, good faith belief in the truth of the specific misrepresentations alleged in the indictment in determining whether or not the defendant acted with intent to defraud. . . . .

*Id*.

The court then declined to give Mr. Hansen's additional instructions on good faith clarifying: (1) that good faith is a complete defense, (2) the government bore the burden of proving intent to defraud, and (3) that an honestly held belief can

---

[9] Commentary, Ninth Circuit Manual of Model Criminal Jury Instructions, 2010 Edition, Instruction No. 5.12.

35

negate intent to defraud even if that belief is mistaken.  ER II p. 244; CR 87, p. 5.

Instead, it gave an instruction proposed by the government stating:

> It is no defense to fraud that the defendant honestly holds a certain opinion or belief but also intentionally makes false or fraudulent representations or promises to others.

. ER II pp. 127-28; CR 198, pp. 1918-19.

This confusing instruction, which is not part of the Ninth Circuit Model Criminal Jury Instructions, tells the jury that even if a defendant honestly believes something, if he also intentionally makes a statement that is false, his own honest belief is irrelevant.  The instruction indicates that the defendant need only have the intent to make the representation or promise, and not knowledge that it is false, in that it explicitly addresses a defendant's "honestly" held opinions or beliefs (not assertions the defendant knows are false).

The instruction is *not* a correct statement of the law.  A good faith belief negates specific intent to defraud.  As summarized by one court, the

> elements of both mail fraud and wire fraud require the Government to prove that a defendant knowingly devised a scheme or plan to defraud or to obtain money or property by making false promises or statements, *that the defendant knew that the promises or statements were false or fraudulent*, that the promises or statements were material, that the defendant acted with the intent to defraud, and that the defendant used or caused to be used either the mails or the wires to carry out an essential part of the scheme.

*United States v. Harder*, 116 F. Supp. 3d 1197, 1206 (D. Or. 2015) (emphasis added). *See also United States v. Lothian*, 976 F.2d 1257, 1267 (9th Cir. 1992) (in mail or wire fraud case, government must prove the defendant "willfully participated in a scheme *with knowledge of its fraudulent nature . . . .*") (emphasis added, internal quotations and citations omitted); *United States v. Alkins*, 925 F.2d 541, 549 (2d Cir. 1991) ("Good faith is a complete defense to a mail fraud charge."). A jury should be told that if a defendant "honestly holds a certain opinion or belief," he cannot know that statements of that belief are false or fraudulent and thus cannot have specific intent to defraud.

The "no defense" instruction rendered meaningless the instruction that "[y]ou may determine whether a defendant had an honest, good faith belief in the truth of the specific misrepresentations alleged in the indictment in determining whether or not the defendant acted with intent to defraud." It did this by telling the jury that even if it found a defendant had an honest, good faith belief in a representation, if the representation was, in fact, false or fraudulent, then the defendant's honest good faith belief was not a defense. Again, this is a misstatement of the law and it had the effect of eliminating the defense theory before the jury could even consider it. Put another way, the jury could determine Mr. Hansen honestly believed the AHA adoption program would lead to citizenship, but as long as the jury also determined the AHA adoption program was

37

not, in fact, a path to citizenship—which both parties acknowledged—Mr.

Hansen's honest belief would be "no defense."

The government found the "no defense" language of its instruction in *United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010). In *Treadwell*, the defendants ran a fraudulent investment scheme. Their defense theory was that although they intentionally lied to their investors, they always believed they would make money in the end. *Treadwell*, 593 at 994. This is distinct from a defense theory that the defendant actually believed the statements he made. At trial, the *Treadwell* defendants did not object to an instruction providing, "it is no defense to fraud that [the defendant] honestly holds a certain opinion or belief, [but] also knowingly makes false or fraudulent promises, representations, or promises to others." *Treadwell*, 593 F.3d at 994. On appeal, the defendants did not challenge this language. Instead, they argued "intent to defraud" should have been defined to require "an intent to cause a financial loss to victims." *Id*. at 996. This Court rejected the argument that 18 U.S.C. § 1343 requires intent to cause pecuniary loss. *Id*. at 996-99. It said nothing about the portion of the instruction stating "[i]t is no defense to fraud that the defendant honestly holds a certain opinion or belief but also intentionally makes false or fraudulent representations or promises to others."

The Fifth and Sixth Amendments to the United States Constitution require criminal convictions to rest upon a jury determination that the defendant is guilty

38

of every element of the crime with which he is charged beyond a reasonable doubt. *United States v. Gaudin*, 515 U.S. 506, 509–10 (1995). Jury instructions misstate the essential elements of an offense when they misrepresent the required intent. *See United States v. Vazquez-Hernandez*, 849 F.3d 1219, 1229 (9th Cir. 2017) (in attempted illegal reentry case, jury instruction omitting requirement that defendant had to desire to enter United States without official restraint was plain error); *United States v. Montoya-Gaxiola*, 796 F.3d 1118, 1122–24 (9th Cir. 2015) (plain error where jury instruction did not specify that defendant charged with possession of unregistered firearm must not only know he had weapon, but also to know what features of weapon brought it within statute's definition of "firearm"). It is well-settled that, "[a]n error in jury instructions requires reversal unless there is no reasonable possibility that the error materially affected the verdict or, in other words, that the error was harmless beyond a reasonable doubt." *United States v. Pierre*, 254 F. 3d 872, 877 (9th Cir. 2001).

Here, the defense presented evidence that Mr. Hansen actually believed the adoption program would lead to citizenship, *i.e,.* that he had a good faith belief in his statements that negated specific intent to defraud. Mr. Hansen described the adult adoption program to a federal fraud detection officer and voluntarily sent that officer the names of participants, actions indicating he had no fear he was breaking the law. ER II pp. 143-44; CR 181-7, pp. 1613-14. Mr. Hansen also invited

39

immigration officials and a Congressional staff member on a tour of the AHA office. ER II pp. 144-46; CR 181-7, pp. 1614-16. On this three-hour tour, Mr. Hansen explained to the group how the program worked. ER II p. 140; CR 181-7, p. 1467. Again, this indicates Mr. Hansen did not think the program was a fraud but instead was proud to boast of it to government and law enforcement officials. Mr. Hansen testified that he believed that under a United Nations law, adult adoption could lead to citizenship. ER II pp. 136-37; CR 181-7, pp. 1453-55. Expert testimony described how a person with Mr. Hansen's mental health conditions could continue to believe in and promote a program despite being presented with evidence that it did not work. ER II p. 154; CR 181-7, p. 1643.

In light of the evidence that Mr. Hansen actually believed in the adult adoption program, the incorrect jury instruction was not harmless beyond a reasonable doubt. The jury may have found Mr. Hansen honestly believed the AHA adoption program would lead to citizenship, but as long as it also determined the AHA adoption program was not, in fact, a path to citizenship, it was instructed that Mr. Hansen's honest belief was "no defense." Because Mr. Hansen contested the element at issue and raised evidence to support a contrary finding by the jury, the error was not harmless beyond a reasonable doubt. *Neder v. United States*, 527 U.S. 1, 19 (1999).

40

### E. The District Court Erred in Failing to Dismiss Counts Seventeen and Eighteen.

In Counts Seventeen and Eighteen, Mr. Hansen was convicted of violations of 8 U.S.C. § 1324(a)(1)(A)(iv).  Mr. Hansen moved to dismiss these counts of conviction on constitutional grounds but the district court denied the motion, simply stating that this Court should decide this issue.  ER I p. 8; CR 200, p. 8.

8 U.S.C. § 1324(a)(1)(A)(iv) makes it a felony to "encourage[] or induce[] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law."  As argued below, the statute is vague and overbroad in violation of the Due Process Clause and the First Amendment to the United States Constitution.  In addition, it is unconstitutional as applied to Mr. Hansen.

### 1. On Its Face 8 U.S.C. Section 1324(a)(1)(A)(iv) is Void for Vagueness.

"The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due process.'" *Johnson v. United States*, 135 S. Ct. 2551, 2556-57 (2016) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).  A vague criminal statute runs afoul of the Due Process Clause when it (1) fails to provide sufficient notice of the conduct it prohibits; or (2) encourages arbitrary and discriminatory enforcement.

41

*United States v. Coutchavlis*, 260 F.3d 1149, 1155 (9th Cir. 2001) (*citing Hill v. Colorado*, 530 U.S. 703, 732 (2000)); *See also Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

As written, § 1324(a)(1)(A)(iv) encompasses a vast range of everyday activities that may cause or facilitate an undocumented person's residence in the United States. This Court has held that "to encourage" within § 1324(a)(1)(A)(iv) means "to inspire with courage, spirit, or hope . . . to spur on . . . to give help or patronage to," and that it can be "equated . . . with 'helped.'" *United States v. Thum*, 749 F.3d 1143, 1147 (9th Cir. 2014). To "induce" means "to move by persuasion or influence." *United States v. Rashkovski*, 301 F.3d 1133, 1136 (9th Cir. 2002). These expansive terms necessarily mean different things to different people. Moreover, taken at face value, they encompass a broad range of everyday activities that may cause or facilitate an undocumented person's residence in the United States. The common meanings of "encourage" and "induce" cover everything from a pat on a shoulder to a financial incentive.

Indeed, a literal reading of the statute would encompass an organization that provides legal aid to migrant farm workers because the assistance may embolden undocumented workers to continue to live in the United States. It would reach a tutor in a community center who helps the child of an illegal immigrant to learn English. It would reach customers patronizing a business run by or engaging

42

services provided by aliens.  It would also criminalize a broad range of

professional interactions by teachers, doctors, therapists, and others who provide

services to aliens.  By "criminaliz[ing] a broad range of day-to-day activity," the

statute would not only leave individuals uncertain whether their conduct was

prohibited, but it "would delegate to prosecutors and juries the inherently

legislative task of determining what type of ... activities are so morally

reprehensible that they should be punished as crimes."  *United States v. Kozminski*,

487 U.S. 931, 949 (1988). Therefore, it would invite "arbitrary or discriminatory

prosecution and conviction."  *Id*.

The uncertainty regarding the statute is especially acute because it involves

the complex, highly regulated area of immigration law.  A 1986 amendment

expanded the statute to include "reckless disregard" for whether an alien is in

violation of law.  Immigration Reform and Control Act of 1986, Pub. L No. 99–

603 § 112, 100 Stat. 3359.  However, "[a]s a general rule, it is not a crime for a

removable alien to remain in the United States."  *Arizona v. United States*, 567

U.S. 387, 407 (2012); *accord Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir.

2012).  Ordinary people, then, do not even have the benefit of clear, easy-to-follow

immigration laws to guide their behavior.

In sum, the statute fails to give ordinary people fair notice of the conduct it punishes and is so standardless that it invites arbitrary enforcement. Accordingly, it is unconstitutionally vague.

### 2. 8 U.S.C. Section 1324(a)(1)(A)(iv) is Overbroad in Violation of the First Amendment.

The vagueness of section 1324(a)(1)(A)(iv) is related to its overbreadth under the First Amendment. *See Grayned*, 408 U.S. at 109 ("where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of [those] freedoms.") (internal quotations and alterations omitted). A statute is overbroad under the First Amendment when it sweeps within its prohibitions activities that are constitutionally protected. *Simon & Schuster v. Members of the New York State Crime Victims Bd.*, 502 U.S. 105, 121-22 (1991); *Grayned*, 408 U.S. at 114-15. Moreover, a statute is invalid if the government criminalizes "lawful speech as the means to suppress unlawful speech." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1738 (2017) (*quoting Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002)). Therefore, in considering overbreadth, the focus is not solely on how much protected speech is criminalized, but also on whether the statute chills the free exercise of speech and activities protected by the First Amendment. *Free Speech Coalition*, 535 U.S. at 255 ("The

overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process.").

In this case, § 1324(a)(1)(A)(iv) does not merely sweep some protected activity within its scope; rather, it targets speech and associational rights. Because subsection (iv) fails to distinguish between mere advocacy and speech that incites imminent lawless action, it does not exclude constitutionally-protected speech. *Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969) (holding state prohibition against advocating violence was unconstitutional under the First Amendment because it failed to distinguish between mere advocacy and incitement to lawless action that is likely to imminently produce such action). In *Packingham*, the Court struck down a statute that imposed restrictions on access to the internet by registered sex offenders, holding that the statute was not narrowly tailored to assure that it did not "burden substantially more speech than is necessary to further the government's legitimate interests." *Packingham*, 137 S.Ct. at 1736 (quoting *McCullen v. Coakley*, 134 S. Ct. 2518, 2535 (2014)). The *Packingham* Court in concluded that the statute prohibiting sex offenders from accessing social networking websites was unconstitutionally overbroad because it chilled legitimate First Amendment speech.

45

That is precisely the effect of the breadth and lack of limiting definitions in § 1324(a)(1)(A)(iv). The language of the statute covers virtually every aspect of the rights that should be protected under the First Amendment:

- Advocacy to political representatives or the general public to loosen immigration enforcement or provide benefits or amnesty for particular aliens or groups of aliens;

- Religious expressions of commitment to supply spiritual or other assistance to aliens in the United States;

- Advising individuals or groups regarding immigration remedies, consequences, and risks;

- Advising individuals about public benefits such as legal, medical, educational, and other services available to undocumented persons.

All these activities and an infinite number of other social and professional contacts conceivably fall within the scope of "encourages or induces" as used in § 1324(a)(1)(A)(iv). Furthermore, the individual need not even know that the encouragement or inducement pertains to conduct in violation of immigration law; the statute provides that "reckless disregard" is sufficient. The statute criminalizes, or at least chills, vast amounts of protected speech and associational activities.

46

### 3. 8 U.S.C. Section 1324(a)(1)(A)(iv) is Unconstitutional as Applied to Mr. Hansen.

In the alternative, Mr. Hansen raises an as-applied challenge to the

constitutionality of subsection (iv). "An as-applied challenge contends that the law

is unconstitutional as applied to the litigant's particular speech activity, even

though the law may be capable of valid application to others." *Foti v. City of*

*Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998).

The First Amendment protects individuals from having the government

abridge their freedom of speech. *United States v. Osinger*, 753 F.3d 939, 946 (9th

Cir. 2014). Limited categories of speech are not protected by the First

Amendment, including speech integral to criminal conduct. *Id.* Speech integral to

criminal conduct includes speech that induces someone to break criminal laws.

*See generally United States v. Meredith*, 685 F.3d 814 (9th Cir. 2012). Here, even

assuming that Mr. Hansen encouraged undocumented persons to overstay their

visas, overstaying a visa is a violation of civil law, not of criminal laws. See 8

U.S.C. § 1227(a)(1)(B) ("Any alien who is present in the United States in violation

of this chapter or any other law of the United States, or whose nonimmigrant visa

(or other documentation authorizing admission into the United States as a

nonimmigrant) has been revoked under section 1201(i) of this title, is deportable.);

*see also Arizona v. United States*, 567 U.S. 387, 396 (2012) ("Removal is a civil,

not criminal, matter."). Thus, Mr. Hansen's speech was not integral to criminal

conduct. Mr. Hansen's speech was protected by the First Amendment and could

not form the basis for a criminal conviction. *Watts v. United States*, 394 U.S. 705,

708 (1969) (remanding case for judgment of acquittal where conviction was based

on protected speech).

### F. The District Court Abused Its Discretion in Applying the Sophisticated Means Enhancement.

Under U.S.S.G. § 2B1.1(b)(10)(C), if the offense "otherwise involved

sophisticated means" the offense level is increased by two. The Application Notes

state

> For purposes of subsection (b)(10)(C), "sophisticated means" means
> especially complex or especially intricate offense conduct pertaining
> to the execution or concealment of an offense. For example, in a
> telemarketing scheme, locating the main office of the scheme in one
> jurisdiction but locating soliciting operations in another jurisdiction
> ordinarily indicates sophisticated means. Conduct such as hiding
> assets or transactions, or both, through the use of fictitious entities,
> corporate shells, or offshore financial accounts also ordinarily
> indicates sophisticated means.

U.S.S.G. 2B1.1, cmt. n 9. As the comment makes clear, the enhancement is

appropriate when the means to commit an offense is "especially complex" or

"especially intricate." *See Stinson v. United States*, 508 U.S. 36, 38 (1993)

(Guidelines commentary "is authoritative unless it violates the Constitution or a

48

federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline").

Fraud necessarily involves successfully deceiving other people or institutions in order to enrich oneself. The "sophisticated means" enhancement is reserved for offenses carried out in an *especially* complex or intricate manner. *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014) ("sophistication requires more than the concealment or complexities inherent in fraud. Thus, fraud *per se* is inadequate for demonstrating the complexity required for enhancement under U.S.S.G. § 2B1.1(b)(10)(C)."). In *United States v. Montano*, 250 F.3d 709 (9th Cir. 2001), this Court rejected the adjustment, recognizing that smuggling "by its nature, involves active steps to avoid detection," and "sophisticated means" requires more than the coverup necessary to commit the crime. *Montano*, 250 F.3d at 715.

Courts have declined to impose the sophisticated means enhancement when even a large-scale fraud scheme is carried out using unremarkable methods. Thus when a defendant created an investment fund, lied to her clients about the nature of the fund and likely return on investment, and forged documents to orchestrate her fraudulent scheme, the sophisticated means enhancement did not apply. *United States v. Brown*, 877 F. Supp. 2d 736, 752 (D. Minn. 2012). Although the defendant told a complex set of lies about financial investments, she opened

49

readily identifiable accounts at local banks and her fraud was easily detectable by authorities. *Id.* Similarly, when defendants carried out a fraud scheme well-crafted enough to deceive a number of counties and municipalities, their use of mass mailings and a website did not warrant a "sophisticated means" enhancement. *United States v. Exec. Recycling, Inc.*, 953 F. Supp. 2d 1138, 1167 (D. Colo. 2013). As the court observed, if use of a website were treated as sophisticated means, then the "enhancement would apply in nearly every fraud case, which surely could not have been the Sentencing Commission's intent when it adopted this enhancement guideline." *Id.*

In the present case, Mr. Hansen made untrue statements about how his adoption program would lead to citizenship. He used regular bank accounts to run his business and he was easy to locate in the large office space he proudly promoted to the public and government officials. His fraud was not sophisticated; authorities very quickly determined that a program promising adult adoption would lead to citizenship was fraudulent. Mr. Hansen even supplied a DHS fraud detection officer with the names of persons participating in the program and led authorities on a tour of his offices, making it extremely easy for law enforcement officers to discover the program.

The district court imposed the enhancement on the ground that use of YouTube and the Internet were techniques "that a general person who is trying to

50

create fraud would not necessarily do or know how to do it." ER I pp. 22-23; CR

200, pp. 22-23. As pointed out in *Exec. Recycling*, use of the Internet and popular

websites are commonplace in today's world and cannot be deemed especially

sophisticated. *Exec. Recycling*, 953 F. Supp. 2d at 1167. Indeed, YouTube is

especially popular with children. It is so simple and commonplace for any amateur

to post videos to YouTube that 400 hours of video are uploaded to YouTube each

minute.[10] Use of the Internet and YouTube to promote a fraudulent scheme simply

cannot be considered "sophisticated means."

### G. The District Court Abused Its Discretion in Applying the Leader/Organizer Adjustment.

Under U.S.S.G. § 3B1.1(c), a defendant's offense level is increased by two

if he was an "organizer, leader, manager, or supervisor in any criminal activity . . .

." To "qualify for an adjustment under this section, the defendant must have been

the organizer, leader, manager, or supervisor of one or more other participants."

U.S.S.G. § 3B1.1, cmt. n. 2; *United States v. Whitney*, 673 F.3d 965, 975 (9th Cir.

2012). A "participant" is "a person who is criminally responsible for the

commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1,

---

[10] Jack Nicas, *YouTube Tops 1 Billion Hours of Video a Day, on Pace to Eclipse TV*, Wall Street Journal Feb. 17, 2017, available at
https://www.wsj.com/articles/youtube-tops-1-billion-hours-of-video-a-day-on-pace-to-eclipse-tv-1488220851 (last accessed June 20, 2018).

cmt. n. 1. The government bears the burden of proving by a preponderance of the

evidence that the factual basis for the enhancement exists. *United States v. Walter-*

*Eze*, 869 F.3d 891, 914 (9th Cir. 2017).

Here, the government did not prove by a preponderance of the evidence that

there were any "participants" in the offense, or persons criminally responsible for

the offense, whom Mr. Hansen supervised. Prior to trial the government filed a

brief stating

> the weight of the evidence supports the conclusion that Defendant
> carried out his fraud scheme without [former AHA employees']
> knowledge . . . in a post-arrest interview Defendant admitted only he
> knew the Migration Program had never worked and could not work.
> Moreover, in addition to a general exculpation of other AHA, NHPI,
> and CIBO employees, Defendant specifically exonerated his top-level
> deputies by name.

ER II p. 242; CR 97, p. 15 n. 5.

The government did not present evidence that anyone Mr. Hansen supervised

knew the program was fraudulent. One AHA employee testified that Mr. Hansen

told AHA employees that 29 people had gotten citizenship through the program.

ER II p. 228; CR 181-2, p. 590. The government even argued to the jury that "Jeff

Sevier did not know. Newalow Weekes did not know. Viola Hansen did not know.

[Mr. Hansen] said only he knew. *That's what really happened in this case. That's*

*what Hansen really believed. That's what['s] really true."* ER II p. 126; CR 198,

p. 1905 (emphasis added). Jeffrey Sevier told the FBI that he believed Mr.

52

Hansen's claim that adult adoption could lead to citizenship and that Viola Hansen achieved citizenship through adult adoption.  PSR ¶ 20.  Certainly the government did not establish by a preponderance of the evidence that anyone other than Mr. Hansen knowingly engaged in mail and wire fraud.

The district court did not find that the government showed anyone other than Mr. Hansen was a "participant" in the fraud.  Instead it applied the adjustment on the ground that "there was extensive activity."  ER I p. 27; CR 200, p. 27.  This is not the test for the 3B1.1(c) adjustment; the defendant must manage, etc., at least one other criminally culpable participant.  The district court erred in interpreting the Guideline and thus abused its discretion in imposing the Section 3B1.1 enhancement.

### H. The District Court Abused Its Discretion by Applying the Abuse of Position of Trust Adjustment.

An offense level is increased by two when "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G. § 3B1.3.  A "position of public or private trust [is] characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)."  U.S.S.G. § 3B1.3, cmt. n. 1.  It is not enough that the defendant holds a position of discretion in some area of his or her life; for the

53

adjustment to apply the defendant must hold a position of trust or discretion from the victims' perspective. *Thomsen*, 830 F.3d at 1073. The commentary lists an attorney serving as a guardian, a bank executive acting as a lender, and a physician purporting to examine a patient, as the type of defendant-victim relationships that might entail the trust that warrants the adjustment. U.S.S.G. § 3B1.3, cmt. n. 1. The adjustment can apply when the defendant pretends to hold a position of trust, but the pretend position must be one that actually entails a fiduciary duty, such as an investment broker or a physician, because such a position gives a defendant an "opportunity to commit a difficult-to-detect crime." U.S.S.G. § 3B1.3, cmt. n. 2.

This Court reviews the district court's application of the abuse-of-trust adjustment under a two-step process. *United States v. Adebimpe*, 819 F.3d 1212, 1217 (9th Cir.), *cert. denied*, 137 S. Ct. 317 (2016). First, it reviews the legal question of whether a defendant occupied a position of trust as defined by the Guidelines *de novo*. *Id*. Then, if the answer is yes, this Court reviews for clear error the district court's decision on whether the defendant's abuse of trust significantly facilitated the offense. *Id*.

Mr. Hansen did not hold or pretend to hold a position of trust or discretion with respect to the customers of AHA. The government pointed out that Mr. Hansen claimed to be trained in immigration law and to have a Ph.D. ER I p. 28; CR 200, p. 28. However, neither training in immigration law nor holding a Ph.D.

54

puts one in a fiduciary relationship with others. *United States v. Mendoza-Benitez*, 119 F. Supp. 2d 48, 50 (D.P.R. 2000) ("[m]ere training and knowledge of the industry's regulations to which the defendant must abide in the operation of his business do not establish the existence of a position of public or private trust."). Furthermore, none of the witnesses testified that claims of training or a Ph.D. by Mr. Hansen led them to put heightened trust in him. Finally, there was no evidence that it was hard to detect Mr. Hansen's offenses because of his claim to have immigration law training or a Ph.D.; government officials did not appear to put any stock in these claims and knew right away that a claim that adult adoptions will lead to citizenship was false.

The district court initially imposed the adjustment on the ground that "the individuals who were caught up in this scheme were very vulnerable . . . ." ER I p. 28; CR 200, p. 28. Later, the district judge assented to the suggestion that it found Mr. Hansen urged the victims to believe his interpretation of the law on the ground that he was an expert in immigration laws with a Ph.D. ER I p. 37; CR 200, p. 37. Even this ground, however, is not adequate to support the adjustment. A claim to have extensive knowledge on a subject does not give rise to a fiduciary relationship between the claimant and others. *Mendoza-Benitez*, 119 F. Supp. 2d at 50. The public may respect the intellect of such people but there is no basis to conclude

indviduals would grant them the special trust or discretion over their funds that would make fraud difficult to detect.

In addition, for the adjustment to apply, the abuse of a position of trust must have "significantly" facilitated the commission or concealment of the offense. Here the victims who testified were primarily persuaded by the false claim that other people had achieved citizenship through adult adoption, not by a belief that Mr. Hansen held a Ph.D. in "immigration law." Thus any "position of trust" Mr. Hansen claimed did not significantly facilitate the offense. Application of the abuse of trust adjustment was unwarranted in this case.

## I. The Statutory Maximum Sentence of 240 Months Imprisonment is Substantively Unreasonable

The district court abused its discretion in imposing a sentence of 240 months, the statutory maximum sentence available. Mr. Hansen had zero criminal history points and only minor traffic violations. *Autery*, 555 F.3d at 874 (under 18 U.S.C. § 3553(a)(1), a defendant's complete lack of criminal history is a mitigating factor not fully accounted for in the Guidelines criminal history calculation). Moreover, the district judge did not dispute that Mr. Hansen's mental health problems played a significant role in the offense, yet it declined to grant his requests for either a downward variance or a downward departure under U.S.S.G. § 5K2.13 to account for the role Mr. Hansen's mental illness played in the offense.

Finally, the 240 month sentence is far more severe than the average sentence for a defendant convicted of fraud in federal court. 18 U.S.C. § 3553(a)(6) (sentencing court shall consider need to avoid unwarranted sentence disparities). In fiscal year 2017, 84.6% of offenses to which U.S.S.G. § 2B1.1 applied, like Mr. Hansen's offense, involved less than $1.5 million in loss amount. See U.S.S.G.'s "Quick Facts" re Theft, Property, and Fraud Offenses in Fiscal Year 2017.[11] However, the average sentence for a 2B1.1 offender was 23 months, less than *one-tenth* of the sentence Mr. Hansen received. *Id.*

In light of the 18 U.S.C. § 3553 factors and the totality of circumstances, the twenty year sentence in this case is substantively unreasonable and should be vacated. *United States v. Sawyer*, __ F.3d __, 2018 WL 3028681, at *4 (2d Cir. June 19, 2018) (vacating 25-year sentence as substantively unreasonable where it failed to give proper weight to Section 3553 factors).

---

[11] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY17.pdf (last accessed June 27, 2018).

## VII.    Conclusion

For the foregoing reasons, Mr. Hansen respectfully requests that this Court reverse his convictions or, in the alternative, vacate his sentence and remand the case for a new sentencing proceeding.

Dated: June 29, 2018

Respectfully submitted

HEATHER E. WILLIAMS
Federal Defender

*s/ Carolyn M. Wiggin*
Carolyn M. Wiggin
Assistant Federal Defender

Attorneys for Defendant-Appellant
HELAMAN HANSEN

58

No. 17-10548

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

HELAMAN HANSEN,

Defendant-Appellant.

Magistrate Judge Case
No. 2:16-cr-00024-MCE-1

Eastern District of California,
Sacramento

BRIEF FORMAT CERTIFICATION
PURSUANT TO CIRCUIT RULE 32-1

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that
the attached brief is proportionately spaced, has a typeface of 14 points and
contains 13,776 words.

Dated: June 29, 2018

Respectfully submitted

HEATHER E. WILLIAMS
Federal Defender

*s/ Carolyn M. Wiggin*
Carolyn M. Wiggin
Assistant Federal Defender

Attorneys for Defendant-Appellant
HELAMAN HANSEN

No. 17-10548

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT

| | |
|---|---|
| UNITED STATES OF AMERICA, | Magistrate Judge Case No. 2:16-cr-00024-MCE-1 |
| Plaintiff-Appellee, | |
| | Eastern District of California, Sacramento |
| v. | |
| HELAMAN HANSEN, | |
| Defendant-Appellant. | |

STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Defendant-Appellant Helaman

Hansen is aware of the following related case: *United States v. Sineneng-Smith*,

Ninth Circuit Docket No. 15-10614. The case involves the constitutionality of 8

U.S.C. Section 1324(a)(1)(A)(iv).

Dated: June 29, 2018

Respectfully submitted

HEATHER E. WILLIAMS
Federal Defender

*s/ Carolyn M. Wiggin*
CAROLYN M. WIGGIN
Assistant Federal Defender

Attorneys for Defendant-Appellant
HELAMAN HANSEN

No. 17-10548

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT

| UNITED STATES OF AMERICA, | Magistrate Judge Case No. 2:16-cr-00024-MCE-1 |
|---|---|
| Plaintiff-Appellee, | |
| v. | Eastern District of California, Sacramento |
| HELAMAN HANSEN, | |
| Defendant-Appellant. | |

CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2018, I electronically filed the Opening Brief and Excerpts of Record Volumes I and II with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 29, 2018

*s/ Alex Moyle*
Alex Moyle